IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER WALLACE<br>104 Wilson Street<br>Bettsville, Ohio 44815 | )<br>)<br>)<br>) | CASE NO.<br><br>JUDGE: |
| Plaintiff, | )<br>) | |
| v. | )<br>) | **COMPLAINT FOR DAMAGES**<br>**AND REINSTATEMENT** |
| NIPPON STEEL INTEGRATED<br>CRANKSHAFT LLC<br>1815 Sandusky Street<br>Fostoria, Ohio 44830 | )<br>)<br>)<br>)<br>) | **JURY DEMAND ENDORSED**<br>**HEREIN** |
| **Serve also:**<br>Nippon Steel Integrated Crankshaft<br>LLC<br>c/o FBT Ohio, Inc.<br>3300 Greta American Tower<br>301 East Fourth Street<br>Cincinnati, Ohio 45202 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| -and- | )<br>) | |
| CHRISTOPHER POST<br>c/o Nippon Steel Integrated Crankshaft LLC<br>1815 Sandusky Street<br>Fostoria, Ohio 44830 | )<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |

Plaintiff, Christopher Wallace, by and through undersigned counsel, as his Complaint against the Defendants, states and avers the following:

## **PARTIES**

1. Wallace is a resident of the village of Bettsville, county of Seneca, state of Ohio.

2. Nippon Steel Integrated Crankshaft LLC ("NSI") is a foreign limited liability company that is licensed to practice business in the state of Ohio.

3. Upon information and belief, Christopher Post is a resident of the state of Ohio.

4. Post was at all times hereinafter mentioned, an individual who was a manager and/or supervisor at NSI who acted directly or indirectly in the interest of NSI.

5. Post was at all times hereinafter mentioned an employer within the meaning of R.C. § 4112.01 *et seq*.

6. Post made and/or participated in the adverse actions asserted herein.

## JURISDICTION & VENUE

7. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Wallace is alleging a Federal Law Claim under the Families First Coronavirus Response Act (FFCRA).

8. All material events alleged in this Complaint occurred in county of Seneca.

9. This Court has supplemental jurisdiction over Wallace's state law claims pursuant to 28 U.S.C. § 1367 as Wallace's state law claims are so closely related to his federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTS

11. Wallace is a former employee of NSI.

12. NSI hired Wallace on or about October 7, 2019.

13. NSI employed Wallace as a machinist.

14. Wallace suffers from bi-polar disorder.

15. Wallace's bi-polar disorder substantially impairs one or more of his major life functions, including working.

16. As a result of suffering from bi-polar disorder, Wallace is and was considered disabled within the meaning of R.C. § 4112.01(A)(13).

17. Despite suffering from bi-polar disorder, Wallace could perform his essential job functions at NSI with or without reasonable accommodations.

18. Wallace did not disclose that he suffered from bi-polar disorder to NSI prior to NSI hiring him.

19. Wallace suffers from post-traumatic stress disorder.

20. Wallace's PTSD substantially impairs one or more of his major life functions, including working.

21. As a result of suffering from PTSD, Wallace is and was considered disabled within the meaning of R.C. § 4112.01(A)(13).

22. Despite suffering from PTSD, Wallace could perform his essential job functions at NSI with or without reasonable accommodations.

23. Wallace did not disclose that he suffered from PTSD to NSI prior to NSI hiring him.

24. Wallace suffers from depression.

25. Wallace's depression substantially impairs one or more of his major life functions, including working.

26. As a result of suffering from depression, Wallace is and was considered disabled within the meaning of R.C. § 4112.01(A)(13).

27. Despite suffering from depression, Wallace could perform his essential job functions at NSI with or without reasonable accommodations.

28. Wallace did not disclose that he suffered from depression to NSI prior to NSI hiring him.

29. Wallace suffers from insomnia.

30. Wallace's insomnia substantially impairs one or more of his major life functions, including working.

31. As a result of suffering from insomnia, Wallace is and was considered disabled within the meaning of R.C. § 4112.01(A)(13).

32. Despite suffering from insomnia, Wallace could perform his essential job functions at NSI with or without reasonable accommodations.

33. Wallace did not disclose that he suffered from insomnia to NSI prior to NSI hiring him.

34. On March 18, 2020, Wallace work up feeling sick.

35. Although Wallace felt sick, Wallace decided to go to work on March 18, 2020.

36. During all material events asserted herein, Bill Kidd is or was the Vice President of NSI.

37. During all material events asserted herein, Kidd has and/or had authority to hire, fire, and/or discipline employees.

38. On March 18, 2020, Kidd instructed Wallace to leave work, go to urgent care, and to remain at home for the rest of the day.

39. On March 18, 2020, Wallace left work and went to an urgent care where he was diagnosed with a fever and a sinus infection.

40. On March 18, 2020, a medical provider at the urgent care provided Wallace a note stating that Wallace was cleared to return to work the next day.

41. On March 18, 2020, upon leaving the urgent care, Wallace called NSI's human resource department.

42. When Wallace called NSI's human resource department on March 18, 2020, Wallace advised NSI that he received a doctor's note clearing him to return to work the next day.

43. When Wallace called NSI's human resource department on March 18, 2020, the human resource representative told Wallace that he could not return to work until he had been fever free for at least 24 hours.

44. When Wallace called NSI's human resource department on March 18, 2020, the human resource representative assured Wallace that he would not be assessed any discipline for missing work as a result of his fever and sinus infection.

45. During all material events asserted herein, Jeremy Gagen was Wallace's supervisor.

46. Gagen texted Wallace on March 19, 2020 to inquire whether Wallace had a doctor's note for his absence.

47. Wallace advised Gagen that he had a doctor's note for his March 18, 2020 absence.

48. Wallace asked Gagen on March 19, 2020 if Gagen could find another employee to cover Wallace's overtime days as Wallace still was not feeling well.

49. Wallace asked Gagen, and Gagen ensured Wallace that it would be alright if Gagen found another employee to cover Wallace's overtime days.

50. In or about March 2020, the COVID-19 pandemic hit the United States and the state of Ohio set out Stay-at-Home Orders as a result of the pandemic.

51. On March 20, 2020, Wallace received a text message from NSI stating that NSI would be closed for the weekend and that any employee who had been laid off should file for unemployment.

52. On March 22, 2020, Wallace received a text message from NSI stating that staff should not return to work unless specifically contacted by a supervisor.

53. Wallace received multiple additional text messages from NSI from March 26, 2020 through April 10, 2020 pushing back the return to work date for the NSI employees.

54. During all material events asserted herein, Christopher Post is and/or was the Chief Operating Officer for NSI.

55. During all material events asserted herein, Post has and/or had authority to hire, fire, and/or discipline employees.

56. On or about April 10, 2020, Post called Wallace and told Wallace that Post wanted Wallace back at work by April 20, 2020.

57. On or about April 17, 2020, Post called Wallace and told Wallace that Post wanted Wallace to return to work on the 6:30 p.m. – 5:30 a.m. shift rather than on Wallace's original schedule.

58. On or about April 17, 2020, Wallace told Post that it would take Wallace some time to prepare himself to be able to work the different shift schedule.

59. On or about April 17, 2020, Post told Wallace the return to work date would be voluntary at that time, but that when Wallace did return to work, that it would have to be at the 6:30 p.m. – 5:30 a.m. shift.

60. Following the April 17, 2020 call with Post, Wallace spent the next week preparing himself to work the new shift by switching his medication and sleep schedule.

61. On or about April 23, 2020, Post called Wallace and asked Wallace to return to work.

62. Prior to the April 23, 2020 phone call with Post, Wallace learned from employees of NSI that multiple employees had contracted the COVID-19 virus and/or had COVID-19 virus-like symptoms.

63. During the April 23, 2020 call with Post, Wallace disclosed to Post that Wallace suffered from bi-polar disorder.

64. As a result of disclosing that Wallace suffered from bi-polar disorder, Defendants perceived Wallace to be disabled.

65. During the April 23, 2020 call with Post, Wallace disclosed to Post that Wallace suffered from depression.

66. As a result of disclosing that Wallace suffered from depression, Defendants perceived Wallace to be disabled.

67. During the April 23, 2020 call with Post, Wallace disclosed to Post that Wallace suffered from PTSD.

68. As a result of disclosing that Wallace suffered from PTSD, Defendants perceived Wallace to be disabled.

69. During the April 23, 2020 call with Post, Wallace disclosed to Post that Wallace suffered from insomnia.

70. As a result of Wallace disclosing that he suffered from insomnia, Defendants perceived Wallace to be disabled.

71. During the April 23, 2020 call with Post, Wallace advised Post that Wallace took medicine for his medical conditions.

72. During the April 23, 2020 call with Post, Wallace advised Post that as a result of taking the medication for his medical conditions, Wallace had a weakened immune system.

73. During the April 23, 2020 call with Post, Wallace advised Post that as a result of having a weakened immune system that Wallace was at high-risk for contracting COVID-19.

74. During the April 23, 2020 call with Post, Wallace asked if the return to work date was voluntary, as he would need additional time to adjust his medication and sleep schedule so that Wallace would be able to work the second changed shift time.

75. During the April 23, 2020 call with Post, Post told Wallace that the return to work date was still voluntary at this time, and that Wallace could have time to adjust his medication and sleep schedule to prepare for the second changed shift time.

76. On or about April 28, 2020, Wallace began exhibiting symptoms of the COVID-19 virus.

77. Wallace got tested for the COVID-19 virus on or about April 28, 2020 at the Mercy Health Tiffin Flu Clinic.

78. The Tiffin Flu Clinic advised Wallace that it could take up to a week for the results of Wallace's COVID-19 virus test.

79. The Tiffin Flu Clinic advised Wallace that he should stay home under self-quarantine until he received the results of the COVID-19 virus test.

80. Wallace advised Defendants that he got tested for the COVID-19 virus on April 28, 2020.

81. Wallace advised Defendants that the Tiffin Flu Clinic stated that Wallace should remain in self-quarantine until he received the results of his COVID-19 virus test.

82. On or about May 21, 2020, the Tiffin Flu Clinic advised Wallace that Wallace had tested negative for the COVID-19 virus.

83. Immediately after receiving the news that Wallace had tested negative for the COVID-19 virus, Wallace called NSI's human resource department to advise them of that he had tested negative.

84. Immediately after receiving the news that Wallace had tested negative for the COVID-19 virus, Wallace called NSI's human resource department and left a message stating that he was ready to return to work now that he had tested negative.

85. Wallace provided NSI documentation on May 1, 2020 that he had tested negative for the COVID-19 virus and that he was cleared to return to work.

86. On May 2, 2020, Wallace received a letter from NSI advising him that Defendants had terminated his employment.

87. Defendants' termination letter stated that Wallace's employment had been terminated effective April 30, 2020.

88. As of April 30, 2020, Wallace was still under self-quarantine orders as a result of exhibiting COVID-19 virus symptoms.

89. Defendants were aware that Wallace was under self-quarantine orders on April 30, 2020 as a result of exhibiting COVID-19 virus symptoms.

90. Defendants terminated Wallace's employment in violation of the FFCRA.

91. Congress drafted the FFCRA with the intention of protecting the public at large from the spread of the COVID-19 virus.

92. Ohio Governor Mike DeWine and the Ohio Department of Health issued a "Stay at Home Order" on March 22, 2020, amended on April 2, 2020, ordering all individuals to stay at home except as permitted in the Order.

93. Ohio's Stay At Home Order required individuals to remain at home if they exhibited symptoms of the COVID-19 virus.

94. Ohio recognizes a public policy protecting individuals from the spread of the COVID-19 virus.

95. Defendants terminated Wallace in violation of Ohio's public policy protecting individuals from the spread of the COVID-19 virus.

96. Defendants terminated Wallace's employment because of his medical conditions.

97. Defendants terminated Wallace's employment because of his disability/disabilities.

98. Alternatively, Defendants terminated Wallace's employment because of a perceived disability/disabilities.

## COUNT I:  UNLAWFUL INTERFERENCE WITH FFCRA RIGHTS

### (Against All Defendants)

99. Wallace restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

100. Pursuant to the FFCRA, covered employers are required to provide employees job-protected paid leave for qualified medical and family situations related to the COVID-19 pandemic.

9

101. NSI is a covered employer under the FFCRA.

102. Wallace was an employee eligible for FFCRA due to his severe health conditions (described *supra*) and high-risk status related to the pandemic and due to the duration of his employment.

103. During Wallace's employment, he exhibited symptoms of the COVID-19 virus.

104. During Wallace's employment, Wallace was tested for the COVID-19 virus.

105. During Wallace's employment, Wallace was under doctor's orders to self-quarantine as a result of exhibiting symptoms of the COVID-19 virus.

106. Defendants became aware that Wallace was under doctor's orders to self-quarantine as a result of exhibiting symptoms of the COVID-19 virus.

107. Defendants terminated Wallace while he was under doctor's orders to self-quarantine as a result of exhibiting symptoms of the COVID-19 virus.

108. Defendants' termination of Wallace interfered with Wallace's rights under the FFCRA.

109. As a direct and proximate result of Defendants' conduct, Wallace suffered and will continue to suffer damages.

110. As a direct and proximate result of Defendants' conduct, Wallace is entitled to all damages provided for in the FFCRA.

### COUNT II: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### (Against Defendant NSI)

111. Wallace restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

112. Congress drafted the FFCRA with the intention of protecting the public at large from the spread of the COVID-19 virus.

113. Ohio Governor Mike DeWine and the Ohio Department of Health issued a "Stay at Home Order" on March 22, 2020, amended on April 2, 2020, ordering all individuals to stay at home except as permitted in the Order.

114. Ohio's Stay At Home Order required individuals to remain at home if they exhibited symptoms of the COVID-19 virus.

115. Ohio recognizes a public policy protecting individuals from the spread of the COVID-19 virus.

116. Defendants terminated Wallace in violation of Ohio's public policy protecting individuals from the spread of the COVID-19 virus.

117. Defendants' termination of Wallace jeopardizes these public policies.

118. Defendants' termination of Wallace was motivated by conduct related to these public policies.

119. Defendants had no overriding business justification for terminating Wallace.

120. As a direct and proximate result of Defendants' conduct, Wallace has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages

## COUNT III: DISABILITY DISCRIMINATION IN VIOLATION OF R.C. § 4112.01 *et seq*.
### (Against All Defendants)

121. Wallace restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

122. Wallace suffers from bi-polar disorder.

123. Wallace's bi-polar disorder substantially impairs one or more of his major life functions, including working.

124. As a result of suffering from bi-polar disorder, Wallace is and was considered disabled within the meaning of R.C. § 4112.01(A)(13).

125. Despite suffering from bi-polar disorder, Wallace could perform his essential job functions at NSI with or without reasonable accommodations.

126. Wallace did not disclose that he suffered from bi-polar disorder to NSI prior to NSI hiring him.

127. Wallace suffers from post-traumatic stress disorder.

128. Wallace's PTSD substantially impairs one or more of his major life functions, including working.

129. As a result of suffering from PTSD, Wallace is and was considered disabled within the meaning of R.C. § 4112.01(A)(13).

130. Despite suffering from PTSD, Wallace could perform his essential job functions at NSI with or without reasonable accommodations.

131. Wallace did not disclose that he suffered from PTSD to NSI prior to NSI hiring him.

132. Wallace suffers from depression.

133. Wallace's depression substantially impairs one or more of his major life functions, including working.

134. As a result of suffering from depression, Wallace is and was considered disabled within the meaning of R.C. § 4112.01(A)(13).

135. Despite suffering from depression, Wallace could perform his essential job functions at NSI with or without reasonable accommodations.

136. Wallace did not disclose that he suffered from depression to NSI prior to NSI hiring him.

137. Wallace suffers from insomnia.

138. Wallace's insomnia substantially impairs one or more of his major life functions, including working.

139. As a result of suffering from insomnia, Wallace is and was considered disabled within the meaning of R.C. § 4112.01(A)(13).

140. Despite suffering from insomnia, Wallace could perform his essential job functions at NSI with or without reasonable accommodations.

141. Alternatively, Defendants perceived Wallace as being disabled as a result of his medical conditions.

142. Defendants treated Wallace differently than other similarly-situated employees based on his disabling conditions.

143. Alternatively, Defendants treated Wallace differently than other similarly-situated employees based on his perceived disabling condition(s).

144. Defendants terminated Wallace without just cause.

145. Defendants terminated Wallace's employment based on his disability.

146. Alternatively, Defendants terminated Wallace's employment based on his perceived disability.

147. Defendants violated R.C. § 4112.01 *et seq.* when it discharged Wallace based on his disability.

148. Alternatively, Defendants violated R.C. § 4112.01 *et seq.* when it discharged Wallace based on his perceived disability.

149. Defendants violated R.C. § 4112.01 *et seq.* by discriminating against Wallace based on his disabling condition.

150. Alternatively, Defendants violated R.C. § 4112.01 *et seq.* by discriminating against Wallace based on his perceived disabling condition.

151. Wallace suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq.*

152. As a direct and proximate result of Defendants' conduct, Wallace suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

**DEMAND FOR RELIEF**

WHEREFORE, Wallace demands from Defendants the following:

(a) Issue an order requiring NSI to restore Wallace to one of the positions to which he was entitled by virtue of his application and qualifications, and expunge his personnel file of all negative documentation;

(b) An award against each Defendant of compensatory and monetary damages to compensate Wallace for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $ 25,000 per claim to be proven at trial;

(c) An award of punitive damages against each Defendant in an amount in excess of $ 25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Wallace's claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

    Respectfully submitted,

/s/ *Daniel S. Dubow*
Brian D. Spitz (0068816)
Daniel S. Dubow (0095530)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Boulevard, Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax:   (216) 291-5744
Email:  brian.spitz@spitzlawfirm.com
        daniel.dubow@spitzlawfirm.com

*Attorneys For Plaintiff*

## JURY DEMAND

Plaintiff Christopher Wallace demands a trial by jury by the maximum number of jurors permitted.

                                                  */s/ Daniel S. Dubow*
                                                  Brian D. Spitz (0068816)
                                                  Daniel S. Dubow (0095530)
                                                  **THE SPITZ LAW FIRM, LLC**